UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARC R. MARTER,

                Plaintiff,

                                           Case Number 09-11661-BC
v.                                          Honorable Thomas L. Ludington

JE JOHNSON CONTRACTING, INC.,

                Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CANCELING HEARING

Plaintiff Marc R. Marter filed a one-count complaint on May 1, 2009, alleging that Defendant JE Johnson Contracting, Inc., retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. Generally, Plaintiff alleges that Defendant retaliated against him when it terminated his employment after he opposed three instances of what he perceived to be gender discrimination or sexual harassment.

Now before the Court is Defendant's motion for summary judgment [Dkt. # 16], filed on February 25, 2010. Plaintiff filed a response [Dkt. # 18] on March 18, 2010; and Defendant filed a reply [Dkt. # 19] on March 25, 2010. The Court has reviewed the parties' submissions and finds that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. E.D. Mich. LR 7.1(e)(2). For the reasons stated below, Defendant's motion will be granted.

I

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the

claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

## II

In 1990, Plaintiff received a Bachelor's degree in mechanical engineering from Michigan Technological University. In 1999, he received a Master of Business Administration ("MBA") degree from Northwood University. After obtaining his MBA, Plaintiff worked at Delphi, a company primarily involved in the automotive industry. On or about May 15, 2006, Defendant's General Manager and Vice President Greg Younk hired Plaintiff as an engineering manager. Defendant is a full service mechanical contractor based in Midland, Michigan, that provides process piping, pipe fitting, welding, plumbing, sheet metal, and related services.

As an engineering manager in Defendant's employ, Plaintiff was responsible for supervising project managers, estimators, operators, and quality assurance. Def. Br. Ex. B (No. 0090). Plaintiff's primary function was to "provide expertise and assistance in the development of the necessary information for accurate estimates and drawings to facilitate the development of profitable quotations." *Id.* Plaintiff was also responsible for "overseeing the purchasing functions and the Project Management of Projects to ensure on-time project completion within budgets, while ensuring the achievement of the gross profit and sales goals." *Id.*

Throughout his employment, Plaintiff's performance was evaluated by Younk, as Plaintiff's direct supervisor. In a performance review dated December 1, 2006, with respect to "areas of strengths and improvements," Younk noted that Plaintiff was "[r]apidly learning the contracting business. Interacts well with employees & staff. Able to work through obstacles and delegates effectively. Communicates very well." Def. Br. Ex. B. (No. 0109). With respect to "areas needing improvement," Younk noted that Plaintiff "[n]eeds to be tuned into upcoming projects in order (sic) forecast estimates. Post project reviews to share opportunities with estimating group. Review of job costs need to be reviewed more frequently by all P.M's. Standardize the design/build proposal process." *Id.* (No. 0109-0110).

Subsequently, in the first quarter of 2007, when Defendant's Executive Vice President, John Billinghire, began working with Plaintiff, Billinghire testified that he encountered problems with the information received from Plaintiff's department. Billinghire Tr. 14, Jan. 29, 2010 (Def. Br. Ex. D). For example, "projection[s] that the project managers were making seemed to be understated." *Id.* Billinghire testified that he discussed Plaintiff's performance with Younk and advised Younk that "he's got to either get rid of him or turn him around." *Id.* 20. While Billinghire felt that Plaintiff "had a lot of talent," he thought "some things were misdirected" and that "his performance, or his commitment" was missing. *Id.* Younk told Billinghire that he wanted to work with Plaintiff to give him a chance. *Id.*

On May 4, 2007, Plaintiff provided written notice to Human Resources Director Dan Ratell regarding his belief that "I am possibly being leaned on harder or treated unfairly because I observed and offered an opinion on inappropriate office behavior." Def. Br. Ex. B (No. 0115). In his note, Plaintiff recorded that on or about April 2, 2007, Plaintiff observed Billinghire make a comment to

employee Beth Huntley "about looking good in [a] skirt and whistling at her." *Id.* On the evening of April 13, 2007, at a "get-together," Plaintiff apologized to Beth about the comments made by Billinghire. *Id.* According to Plaintiff, on or about April 16, 2007, Billinghire apologized to Beth about his behavior. *Id.*

Plaintiff noted that on April 13, 2007, he received his review, and expressed his belief that Younk and Billinghire began to treat him differently after he spoke to Huntley about Billinghire's comments. *Id.* In particular, Plaintiff asserted that they threatened to fire Plaintiff for "undocumented performance issues." *Id.* Plaintiff expressed his belief that he was "blamed for things I did not do (such as miss 6 bids when I feel partly responsible for missing only one) or at least the situation is being misrepresented to others in the organization." *Id.* Consistent with his written statement, with respect to the six "missed" bids, Plaintiff testified that the estimating group did not miss the bids, rather, Younk made the "go, no go" decision as to those bids. Pl. Tr. 95, Jan. 28, 2010 (Def. Br. Ex. C). Plaintiff testified that he felt that Younk was "micro managing" the bids. *Id.* 96.

Also consistent with his written statement, Plaintiff specifically testified that Billinghire "started hooting and/or whistling and going woo woo and making those sorts of gestures" towards Huntley when she "walked in wearing a shorter than usual skirt." *Id.* 65. Plaintiff further testified that Huntley's "face got red and she walked out of the office." *Id.* 66. Plaintiff testified that when he later apologized to Huntley, she acknowledged that she had been embarrassed. *Id.* 66.

Nonetheless, Huntley stated in an affidavit that Billinghire did not whistle at her, but told her that she "looked nice in a skirt." Huntley Aff. ¶ 6, Feb. 24, 2010 (Def. Br. Ex. J). She stated that she had received similar compliments from other co-workers and did not consider such comments

to be "harassing, disrespectful, or sexual in any way." *Id.* ¶¶ 6-7. She stated that she told Plaintiff that he should not be offended and that she told Dan Ratell that she was not offended by the comment. *Id.* ¶¶ 8-9; *see also* Ratell Tr. 6, Jan. 29, 2010 (Def. Br. Ex. K). She told Ratell that she thought that "Plaintiff was trying to get Mr. Billinghire in trouble because Plaintiff did not like him." Huntley Aff. ¶ 12.

Jason Johnson, a project manager and son of company President and Chief Executive Officer Jim Johnson, stated in an affidavit that he was in Plaintiff's office when Billinghire "complimented" Huntley, and he did not perceive the comment as sexual harassment. Jason Johnson Aff. ¶ 9, Feb. 25, 2010 (Def. Br. Ex. I). Billinghire acknowledged telling Huntley on at least two occasions that she looked good in a skirt, but did not recall whistling at her. Billinghire Tr. 16. Ratell testified that he did not take any additional actions in response to Plaintiff's later written notation of events because he did not think it was "a formal complaint," but "more of an agreement of some of these events." Ratell Tr. 10.

On June 28, 2007, Plaintiff expressed concerns to Younk about working with Billinghire. Pl. Tr. 97. He thought that Billinghire's "conservative" or "coercive" style of management was not effective. *Id.* Plaintiff also expressed concerns about Billinghire sleeping in meetings and using "excessive loud profanity." *Id.* 98. Plaintiff criticized the fact that Billinghire would hold him accountable "for things that he didn't think were right in the group" in front of Plaintiff's "direct reports," such as project managers, which negatively affected the employees' incentives to listen to Plaintiff. *Id.* 99.

In a September 2007 review, Younk gave Plaintiff ratings of four and five, on a scale of one to five with five being the best, across approximately forty different criteria; and only a three in

"[m]aintains a neat and orderly work area." Def. Br. Ex. B. (No. 0118-120). With respect to "areas of strengths and improvements since last review," Younk noted that Plaintiff "[h]as improved in reaction to constructive criticism and suggestions. Engineering/design functions appear to have been streamlined. Information from project managers has improved." *Id.* (No. 0151).

With respect to "areas needing improvement," Younk noted that Plaintiff needed to "[t]urn around requested information in a timely fashion. Develop better understanding and comprehensive information on bid docket. Develop use and understanding of Quickpen software." *Id.* Younk further noted that Plaintiff's "[o]verall performance has improved. Work with the project managers to improve project schedules. Institute Microsoft Project cd training and have completed by February 2008. All project managers need to complete BBP's Post project review meetings are non existent. Areas of opportunity exists whereby project issues are communicated back to estimating group." *Id.* After meeting with Plaintiff, Younk clarified that reviews were completed on two projects. *Id.*

In a review dated March 28, 2008, Younk rated Plaintiff across eight categories, and gave Plaintiff a rating of five in one category and a rating of four in four categories. Plaintiff received a three in the categories of "[d]evelop a procedure to consistently ensure submitted bids are followed up to determine the status of award and bid ranking," and "[d]evelop standardize (sic) engineering procedures for design/build proposals." Finally, Plaintiff received a two in the category of "[c]onduct (1) post project review per project manager per month." Def. Br. Ex. B (No. 0011).

With respect to "areas of strengths and improvements since last review," Younk noted that Plaintiff "[h]as settled into the position fairly well. Understand the importance of stretching the estimating group to ensure proposals are completed. Provides good direction for design engineer

and runs interference. Has started to become more intimately involved with the estimating process." Def. Br. Ex. B. (No. 0173). With respect to "areas needing improvement," Younk noted that Plaintiff needed improvement "[h]olding project managers accountable to completing project documentation as per the company procedures established. Use and understanding of Quickpen software." *Id.* (No. 0173-0174).

Younk further noted that Plaintiff's "[o]verall performance has improved. Work with project managers to improve project schedules. Institute Microsoft Project cd training and have completed by July 2008. All project managers need to complete BBP's Post project review meetings are non existent. Areas of opportunity exists whereby project issues are communicated back to the estimating group." *Id.* (No. 0174).

Younk spoke to Plaintiff about the issues raised in his performance reviews, Pl. Tr. 117-20, but never provided Plaintiff with any written disciplinary actions nor recorded any verbal disciplinary actions, Younk Tr. 29, Jan. 29, 2010 (Def. Br. Ex. A). Younk testified that at some point Plaintiff accused Younk of being a micro-manager, to which Younk responded, "if you could do your job, I wouldn't have to micro-manage." Younk Tr. 61.

In the summer of 2008, Tina Getgood, a pregnant employee of Defendant's, was told by her doctor that she should not be exposed to fumes in the shop where she was working. Pl. Tr. 78. Plaintiff believed that Getgood's experience qualified her to be an engineering assistant, and he requested to bring her in as his assistant as a way of accommodating her and filling an open position. *Id.* 78, 80. Younk testified that he was surprised when Plaintiff proposed placing Getgood in the assistant engineering position because she did not have the type of experience for which Defendant was looking. Younk Tr. 45. Similarly, Jason Johnson stated that he never told Plaintiff that he

agreed that Getgood was the best candidate for the assistant position and, in fact, he agreed with Younk's opinion that Huntley, who obtained the position, was "more experienced and better qualified." Jason Johnson Aff. ¶ 11.

Plaintiff testified that Younk told him that he did not believe that Defendant was required to accommodate a pregnant employee. Pl. Tr. 80. Younk did not recall making that statement and testified that Defendant accommodated Getgood. Younk Tr. 45. Ultimately, Defendant moved Getgood to work in the shop foreman's office, away from fumes; and received verification from the employee's doctor that the arrangement was satisfactory. *Id.* 43. After she returned to work, Getgood was assigned to a position in the field, which she requested. *Id.*

Meanwhile, after hearing "sounds of ecstasy," Plaintiff became concerned that Billinghire was viewing pornography in his office and communicated this concern to Ratell. Ratell testified that when he spoke to Plaintiff, he did not "take it as a complaint, it was more of a comment, an observation." Ratell Tr. 13. When Plaintiff perceived that Ratell did not take any action, he sent Ratell an email stating:

> I confidentially informed you . . . of inappropriate behavior I witnessed by JB a few weeks back. I would like to know the outcome of looking into it and what will be done to prevent it from occurring in the future. This is clearly not only disgusting behavior it could create a company liability if not addressed. Secondly, several people have come up to me (even though I didn't inform them of my complaint??) and said that it was not the only occurrence of similar inappropriate sexual material/behavior observed. I am now concerned that nothing will be done to correct behavior and I will receive back-lash (similar to last year after reporting the Beth H. incident) for trying to report clearly inappropriate behavior.
>
> I do not want the issue just dropped.

Pl. Br. Ex. 10 (email dated Sept. 24, 2008). Ratell did not recall responding to Plaintiff's email. Ratell Tr. 15.

Younk testified that he spoke to Billinghire about Plaintiff's report of him watching pornography and that Billinghire denied it. Younk Tr. 47-49. Younk did not identify Plaintiff in the conversation. *Id.* 51. Billinghire testified that, until just before his deposition, he was not aware that it was Plaintiff that had made the complaint. Billinghire Tr. 32. Billinghire also denied ever viewing pornography on his computer at work, but acknowledged that he received the occasional "risque," yet unsolicited email from former colleagues. *Id.* 23-24. Plaintiff testified that another employee, Brian Maraskine, made similar allegations against Billinghire, Pl. Tr. 37-43, but Maraskine denies this. Maraskine Aff. ¶¶ 4-9, Feb. 25, 2010 (Def. Br. Ex. L). *See also* Jason Johnson Aff. ¶ 13; Siegel Aff. ¶¶ 5-7, Feb. 25, 2010 (Def. Br. Ex. M).

On October 3, 2008, Younk terminated Plaintiff's employment. Plaintiff testified that when he was discharged, Younk told him it was "for performance." Pl. Tr. 33; *see also* Ratell Tr. 21. When Plaintiff inquired as to "what performance," Younk indicated that he did not want to discuss or debate it because he had made up his mind and the decision was final. Pl. Tr. 33; Ratell Tr. 21. Younk testified that he ultimately determined that Plaintiff "wasn't getting the job done." *Id.* 60. At his deposition, Younk gave the following explanation for why he felt that Plaintiff was not performing up to expectations at the time his employment was terminated:

> Again, Marc became protective of his group, he wanted to hold meetings off to the side without my involvement. I had a lot of people coming to me about him not being a team player, and there is always a back and forth with regards to whether a project manager pushes the job and has full responsibility, or if its in operations.
>
> And quite frankly, when you're trying to get a project done, it's got to be a team effort on both sides, but the ultimate responsibility comes down to a project manager, and that was a big thing with Marc, he wanted to fight that.
>
> In addition to that, there was (sic) projects that Marc took over when one project manager we hired quit . . . and shop drawings weren't submitted for approval, equipment wasn't ordered on time, projects fell behind, and all the chirping started coming back from the field from foremen to project managers. And so yeah, he had a good evaluation in

March, but things became more and more transparent the more I dug into what was really going on.

Younk Tr. 69.

Consistent with Younk's testimony, Plaintiff testified to his point of view that "the project managers were extremely overloaded with work and it was a debate in the way that the company was structured about the project managers having no control over operations yet being held accountable for them, for operations performance." Pl. Tr. 47. Plaintiff clarified that "[t]he project managers and myself were taking the position that something needed to change in regard to reporting if the project managers were to be responsible for operations, and [Younk]'s position was that project managers are responsible for everything regardless of authority. And what I remember [Billinghire]'s position was that he liked the conflict. . . . [H]e thought it was healthy to have conflict between operations and project managers." *Id.* Plaintiff testified that he expressed his point of view to Younk and Billinghire and that he suggested structuring the project managers "so that they did not have responsibility for operations issues." *Id.* 50.

Randy Stanford, Defendant's controller, who oversees financial aspects of Defendant's business operation, stated in an affidavit that in the summer of 2008, he expressed frustration to Younk about Plaintiff's "lack of urgency, being slow and lack of accepting responsibility." Stanford Aff. ¶ 9, Feb. 24, 2010. Stanford stated that he had conversations with Plaintiff "about his not providing necessary project information and documentation in a timely manner." *Id.* ¶ 6. On one occasion, he told Plaintiff that he needed something within three days, but Plaintiff took thirty days to provide it and provided it only after Stanford complained to Younk about Plaintiff's delays. *Id.* Stanford also stated that Plaintiff did not facilitate the proper training of project managers on critical software. *Id.* ¶ 7.

Adam Zdrojewski, a sheet metal superintendent for Defendant, provided an affidavit stating that he also "complained to Greg Younk about the frustrations caused by Plaintiff's lack of urgency, being slow, the lack of timely obtaining permits, and lack of accepting responsibility." Zdrojewski Aff. ¶ 7, Feb. 4, 2010 (Def. Br. Ex. F). Zdrojewski specifically described a project on which he felt that Plaintiff had been responsible for incomplete engineering submittals, missed deadlines, and expensive overtime. *Id.* ¶ 8. He also stated that Plaintiff did not give him or his co-workers "enough information so we could have a good understanding of [a] project," that "Plaintiff's bids or estimates were not accurate or double checked," and that Plaintiff created a "bottleneck." *Id.* ¶ 9-10.

Justin Trent, a project manager, provided an affidavit expressing substantially the same concerns as Zdrojewski. Trent Aff. ¶¶ 6-8, Feb. 22, 2010 (Def. Br. Ex. G). Likewise, Larry Smith, a project manager who eventually took over Plaintiff's position, stated that he had concerns regarding Plaintiff's "not properly overseeing projects, not providing assistance to project managers, not providing accurate and timely estimate information, not providing the necessary project information on time." Smith Aff. ¶ 7, Feb. 25, 2010 (Def. Br. Ex. H); *see id.* ¶¶ 6, 8-9. Jason Johnson echoed the concerns that Plaintiff lacked an appreciation for the "need for prioritization and urgency." Jason Johnson Aff. ¶ 3; *see also id.* ¶¶ 4-8.

Ultimately, Defendant paid Plaintiff four weeks of severance pay and Plaintiff obtained employment with CDI Corporation in November 2008 as an engineer and in business development.

III

Title VII prohibits retaliation against employees who invoke rights under its provisions. It provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment

-12-

practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). At the summary judgment stage, courts employ the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze retaliation or opposition claims. *See Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000).

To make out a prima facie case of retaliation under the *McDonnell Douglas* framework, a plaintiff must demonstrate that:

(1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Id.* (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)).

In particular, with respect to the fourth element, causation, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citations omitted). "[E]vidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.* (citation omitted). Nonetheless, "temporal proximity between the protected activity and the adverse action, in and of itself, is [not] sufficient to establish a causal connection." *Id.* at 566 (citing *Cooper v. City of N. Olmsted*, 795 F.2d 1265 (6th Cir. 1986)). "[O]ther compelling evidence" is required. *Id.* (quotation omitted).

After a plaintiff establishes a prima facie case of retaliation, the defendant may rebut the plaintiff's prima facie case by articulating a "legitimate, non-discriminatory reason" for the adverse employment action. *Morris*, 201 F.3d at 792-93 (citations omitted). Finally, "[t]he plaintiff, who

bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.' " *Id.* at 793 (quotations omitted). "A plaintiff may demonstrate that an employer's proffered legitimate reason for an adverse employment action is pretextual on any of three grounds: 1) by showing that the reason has no basis in fact; 2) by showing that the reason did not actually motivate the employer's action; or 3) by showing that the reason was insufficient to motivate the action." *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Defendant contends that Plaintiff cannot establish the first and fourth elements of a prima facie case, nor can he establish pretext. Defendant also argues that Plaintiff cannot establish a claim for retaliatory harassment by demonstrating that he was subjected to severe or pervasive harassment. Plaintiff did not respond to this argument and expressly concedes that he has not stated a "retaliatory harassment" claim. Pl. Br. 18 n.6.

First, Defendant contends that Plaintiff's expression of "opposition" to Billinghire's comment to Huntley regarding her skirt, Billinghire's alleged viewing of pornography, and Defendant's refusal to accommodate Getgood's pregnancy does not amount to "protected activity" because it was not opposition to "any practice made an unlawful employment practice" under Title VII. Defendant contends that these incidents do not rise to the level of creating a "hostile work environment" within the meaning of Title VII, citing *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir.

2008) ("[T]he conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim.") (quotations omitted).

In response, Plaintiff does not dispute that the conduct does not rise to the level of creating a "hostile work environment." Instead, Plaintiff contends that he engaged in "protected activity" because "a violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000) (citing EEOC Compliance Manual, (CCH) ¶ 8006); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989) ("A person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful."). Ultimately, it is required that "the manner of opposition must be reasonable, and that the opposition be based on 'a reasonable and good faith belief that the opposed practices were unlawful.' " *Id.* at 579 (quoting EEOC Compliance Manual, (CCH) ¶ 8006). An employee's chosen manner of opposition may not be reasonable when it "violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals." *Booker*, 879 F.2d at 1312.

Plaintiff contends that there is at least a genuine issue of material fact as to whether Plaintiff had a "reasonable and good faith belief that the opposed practices were unlawful" based on the following: Ratell testified that Plaintiff seemed concerned when he made his complaint regarding Billinghire viewing pornography. Ratell Tr. 12-13. Plaintiff's September 28, 2008, email to Ratell also evidences Plaintiff's belief that Billinghire's alleged behavior was "completely inappropriate" and could have legal implications for Defendant. Pl. Br. Ex. 10. Indeed, Ratell testified that, if true, Plaintiff's complaints fell within Defendant's sexual harassment policy. Ratell Tr. 7, 12-13. Defendant did not reply to Plaintiff's argument regarding his "reasonable and good faith belief."

Based on the fact that Plaintiff must only demonstrate a "reasonable and good faith belief that the opposed practices were unlawful," Plaintiff has raised a genuine issue of material fact as to whether Plaintiff engaged in "protected activity" to satisfy the first element of a prima facie case. Defendant is not entitled to summary judgment on this ground. Although it is questionable whether Plaintiff's comments or reporting of perceived gender discrimination or sexual harassment constitute "opposition" within the meaning of Title VII, Defendant did not raise the issue. *See Booker*, 879 F.2d at 1313 (finding that "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition . . . [o]therwise, every employment decision by an employer would be subject to challenge under . . . civil rights legislation . . . [and] would constitute an intolerable intrusion in the workplace").

Second, Defendant contends that Plaintiff cannot establish a causal connection between any protected activity and Defendant's termination of Plaintiff's employment. Defendant emphasizes that there is no evidence that any employee of Defendant made hostile comments towards Plaintiff regarding his reporting of what he perceived as inappropriate behavior. Defendant further contends that it responded in good faith to Plaintiff's concerns by investigating Billinghire's comments to Huntley and alleged viewing of pornography. Defendant emphasizes that it accommodated Getgood's pregnancy and that both Getgood and Huntley continue to work for Defendant.

In response, Plaintiff contends that he can establish a causal connection because temporal proximity is sufficient. Plaintiff relies on *Mickey v. Zeidler Tool & Die Co.*, wherein the Sixth Circuit explained that in a "limited number of cases . . . where an employer fires an employee immediately after learning of a protected activity, we can infer a causal connection between the two actions." 516 F.3d 516, 525 (6th Cir. 2008). In *Mickey*, the morning of the day that the employer

learned of the plaintiff's EEOC charge, an employee of the defendant following the plaintiff "into his office, told him that he was laid off, and that he should pack up his things." *Id.* While the court did not rely on other facts, it noted that a reduction in the plaintiff's salary and benefits earlier that year along with occasional inquiries regarding the plaintiff's retirement plans "constitute sufficient additional circumstantial evidence" of retaliatory discrimination. *Id.* at 526.

Plaintiff emphasizes that in *Johnson*, the Sixth Circuit found that the plaintiff established a causal connection when he was discharged from his position as Vice President of Human Resources and Human Relations one month after he filed an EEOC charge and had strong evaluations prior to the filing of the charge. 215 F.3d at 582-83. Plaintiff emphasizes that Defendant terminated his employment only nine days after his September 28, 2008 email to Ratell regarding his concerns, Plaintiff's evaluations were good prior to his discharge, and Plaintiff was never formally disciplined.

However, *Johnson* is distinguishable from the instant case because Plaintiff's performance reviews, while consistently good, also consistently documented performance issues that are corroborated by the affidavits and testimony of numerous of Defendant's employees. More importantly, in *Johnson*, there was circumstantial evidence beyond temporal proximity and the plaintiff's strong evaluations to support the plaintiff's claims of retaliatory discrimination based on his opposition to what he perceived to be the defendant's unlawful hiring practices. In particular, the plaintiff was "excluded from a retreat where many other human resource administrators met to discuss [a] merger," the defendant had resisted the plaintiff's efforts to hire minorities, the plaintiff received a negative evaluation after he filed an EEOC complaint, and the plaintiff's employment was terminated immediately after he accused the employer of giving him a negative evaluation in retaliation for his EEOC complaint. 215 F.3d at 581, 583.

Here, Plaintiff has not produced sufficient evidence to support an inference that Defendant would not have terminated his employment had he not complained about the conduct that he perceived to be gender discrimination or sexual harassment. *See id.* at 582 (explaining that the plaintiff must "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity [which requires] the court to draw reasonable inferences from that evidence, providing it is credible") (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). Thus, Defendant is entitled to summary judgment because Plaintiff cannot establish the fourth element of a prima facie case.

Third, assuming that Plaintiff can establish a prima facie case, Defendant argues that Plaintiff cannot demonstrate that Defendant's stated issues with his performance were merely pretext for discrimination. Defendant highlights the fact that Plaintiff's "[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of . . . discrimination." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 584 (6th Cir. 2003). Defendant focuses on the fact that Plaintiff "must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001); *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect."). Finally, Defendant emphasizes that "[t]he soundness of an employer's business judgment . . . may not be questioned as a means of showing pretext." *Brocklehurst v. PPG Indus.*, 123 F.3d 890, 898 (6th Cir. 1997).

Defendant specifically relies on *Koval v. Dow Jones & Co.*, wherein the discharged plaintiff had a history of positive evaluations, but also criticism that he "was territorial and did not work well with people in other departments." 86 F. App'x 61, 69-71 (6th Cir. 2004). While the plaintiff had shown improvement at various times, "the matters cited by defendants as supporting the discharge justification occurred after these positive evaluations." *Id.* at 71. The court concluded that it was reasonable for the employer to deduce, in light of recent specific events and past criticism, that the plaintiff "was again exhibiting negative and territorial leadership traits." *Id.* Thus, the employer held an "honest belief" in its discharge rationale and there was no evidence to suggest that the belief did not motivate the discharge decision. *Id.*

In response, Plaintiff notes that the Sixth Circuit has found that an employer's changing rationale for an employee's discharge is evidence of pretext, citing *Cicero v. Borg Warner*, 280 F.3d 579, 591 (6th Cir. 2002). Plaintiff does not actually argue that Defendant's rationale has shifted, but essentially argues that this Court should extend that principle in a manner similar to the Seventh Circuit Court of Appeals in *Fischer v. Avanade, Inc.*, 519 F.3d 393 (7th Cir. 2008). In *Fischer*, the court found that a declaration by defendant's employee setting forth, for the first time, a rationale for defendant's employment decision raised "credibility concerns" and "a genuine issue of material fact as to whether th[e] justification is a later fabrication." 519 F.3d at 407. The court found it significant that the plaintiff had unsuccessfully sought an explanation from defendant's human resources department and that the employee who wrote the subsequent declaration did not offer the rationale at his deposition. *Id.*

Here, Plaintiff emphasizes that he asked Younk for the specific reason for his discharge when it occurred and that Younk refused to answer. Plaintiff contends that even Younk's explanation at

his deposition was "generic," and that Defendant only sets forth "after-the-fact reasons" for Plaintiff's discharge in its motion for summary judgment.

In reply, Defendant emphasizes that unlike in *Fischer*, Plaintiff was informed that he was being discharged based on his performance. In addition, contrary to Plaintiff's assertions, Younk's deposition testimony regarding issues with Plaintiff's performance is fairly detailed, as are his performance reviews, about which Plaintiff acknowledged Younk spoke to him. Defendant also emphasizes that unlike here, in *Cicero*, the defendant employer never raised any complaints about the plaintiff's performance until after it fired him and "showed no contemporaneous evidence that any failures by Cicero caused it concern." 280 F.3d at 591.

Neither *Fischer* nor *Cicero* are analogous to the facts of the case at hand because Defendant has consistently explained that Plaintiff was discharged based on his job performance. While Plaintiff has disputed whether certain problems should have been attributed to his performance, rather than to the structure and management of the company, it is undisputed that Defendant consistently held Plaintiff responsible for those problems. Although Younk simply advised Plaintiff that "performance" was the reason for his termination at the time of his termination, Younk's response is necessarily viewed in light of the prior discussions between Younk and Plaintiff regarding performance issues. Moreover, Younk's deposition provides specific examples and details, as do several affidavits of other employees of Defendant. Based on the above, Defendant is entitled to summary judgment because Plaintiff has not advanced sufficient evidence to demonstrate that Defendant's reason for discharging Plaintiff was pretextual.

IV

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 16] is **GRANTED**.

It is further **ORDERED** that the hearing scheduled for April 29, 2010, is **CANCELED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: April 30, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 30, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS